UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

SAVIANA BOURNE, ALEX JOSEPHS,
RONALDO SMITH, DESHAWN BAUGH,
and SHAQUILLE RAYMOND

Case No. 3:21MJ_931____(TOF)

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANTS

I, Lisa C. MacNamara, being duly sworn, state:

## INTRODUCTION AND AFFIANT BACKGROUND

1.      I submit this affidavit in support of a criminal complaint and arrest warrants for

**Saviana Bourne** (b. 1998), **Alex Josephs** (b. 2000), **Ronaldo Smith** (b. 1998), **Deshawn Baugh**

(b. 2002), and **Shaquille Raymond** (b. 1998) for conspiracy to commit Hobbs Act robbery, in

violation of 18 U.S.C. § 1951(a); Hobbs Act robbery and aiding and abetting Hobbs Act robbery,

in violation of 18 U.S.C. §§ 1951(a) and 2; and brandishing and aiding and abetting the

brandishing of a firearm during and in relation to a crime of violence (Hobbs Act robbery), in

violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (the **Target Offenses**).

2.      I am an investigative or law enforcement officer of the United States within the

meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to

make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI). As an FBI

Special Agent, I have directed, conducted and participated in many criminal investigations of

various federal laws, including bank robberies, commercial robberies, kidnappings, narcotics

investigations, and drug related homicides. During the course of these investigations, I have

worked together with state and local law enforcement agencies to arrest the individuals

responsible for criminal offenses. I have been employed by the FBI as a Special Agent for 26

years. I am an investigative or law enforcement officer of the United States within the meaning

of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct

investigations of and to make arrests for offenses enumerated in Title 18, United States Code,

Section 2516. Prior to becoming a Special Agent for the FBI, I was a sworn police officer in

Madison, Connecticut and New Haven, Connecticut for seven years. Since November 2006, I

have been assigned to the New Haven Division of the FBI, where my primary duty is the

investigation of robbery offenses, as well as other violent crimes. I have participated in numerous

investigations involving individuals suspected of bank robberies, commercial robberies,

kidnappings, narcotics investigations, and drug related homicides, and written, obtained and

coordinated the execution of search and arrest warrants pertaining to individuals involved in

federal offenses. I have prepared numerous affidavits in support of applications for search and

arrest warrants which have resulted in orders being issued by judges, including numerous arrest

warrants for Hobbs Act robbery, which have led to the conviction of numerous defendants for

violations of federal laws. I am authorized to investigate violations of the laws of the United

States and I am a law enforcement officer with the authority to execute federal search and arrest

warrants.

4.      I have participated in the investigation described in this affidavit, and, as a result

of this participation and information received from other law enforcement officers, I am

thoroughly familiar with the circumstances of the investigation and the information set forth in

this affidavit. The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other law enforcement officers. This affidavit is

intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that Saviana Bourne, Alex Josephs, Ronaldo Smith, Deshawn Baugh, and Shaquille Raymond committed the Target Offenses.

6.      Venue is proper in the District of Connecticut because acts in furtherance of the conspiracy were committed in this District, because robberies were committed in this District, and because the robberies affected commerce in this District.

## PROBABLE CAUSE

### A.      Background and the AT&T Robberies

7.      In or around April 2021, the FBI began investigating a crew that has committed a series of violent armed robberies of AT&T stores in and around the greater Hartford, Connecticut area. As further described below, the crew is suspected in successful robberies of AT&T stores in Newington on January 29, 2021, Enfield on February 24, 2021, and Canton on April 15, 2021; attempted robberies of AT&T stores in Torrington on May 15, 2021 and Glastonbury on May 29, 2021; and a successful robbery of an AT&T store in West Springfield, Massachusetts, on June 6, 2021. As further described below, law enforcement encountered the suspects after the June 6 West Springfield robbery, engaged them in a high-speed vehicle pursuit, and ultimately apprehended the suspects after the suspects wrecked their vehicle. Since those arrests, investigators are unaware of any additional Hartford-area armed robberies of mobile phone stores matching the pattern observed in the incidents described below.

### i.      Newington Robbery: January 29, 2021

8.      On January 29, 2021, at approximately 07:35 p.m., Newington Police Department responded to a reported armed robbery at an AT&T store at 3243 Berlin Turnpike in Newington,

Connecticut. Newington Police officers met with employees who were present during the time of the robbery. Based on the employees' reporting, three unknown subjects (UNSUBS) had used the employee entrance from the back of the store to enter. The employees described the UNSUBS as such:

    a. UNSUB 1: Black male; full-face mask with a white skull on it; short, twisted hair; dark clothing.

    b. UNSUB 2: Black male; black knit-style face mask with a pom-pom on top; dark clothing.

    c. UNSUB 3: Black male; all black plastic face mask; dark clothing.

9.    An employee (Witness 1) noticed a suspicious dark SUV parked in the employee parking lot prior to the robbery. Witness 1 noted that the SUV, possibly an older model Mercedes-Benz M class, was suspicious due to it being parked at an employee-only parking lot. Santander Bank across the street from the AT&T employee parking lot had surveillance video footage that captured a dark SUV parked in front of the AT&T employee entrance during the time of the robbery. Santander Bank's surveillance video footage captured three UNSUBS exiting the vehicle and entering the AT&T store through the employee entrance. The driver of the dark SUV did not exit the vehicle. The SUV's front parking lights were on for the duration of the robbery.

10.    Witness 1 was in the back-employee area of the store when he heard the doorbell ring from the employee entrance. Witness 1 opened the door and was met with the UNSUBS. The UNSUBS forced their way in, and as they were coming into the store, they struck Witness 1 in the head with a firearm, opening a gash in Witness 1's head. The UNSUBS then dragged Witness 1 to the vault where the store's phone inventory was kept. The UNSUBS then forced

4

Witness 1 to input his employee code to open the vault. As the vault was being opened, another

employee (Witness 2) walked into the back-employee area and witnessed the incident. The

UNSUBS forced Witness 2 to the ground while pointing a firearm at him. The following still

images from security cameras depict some of the conduct described above:



11.     Once the vault was opened, the UNSUBS took brand-new iPhones into bags that

they had brought. Approximately $52,000.00 in iPhone inventory was stolen. Before leaving the

store, the UNSUBS told Witness 1 and Witness 2 to count to 100 before getting up. The

UNSUBS left the store through the employee back door where they entered from. The Santander

Bank surveillance video footage captured the three UNSUBS getting back into the dark SUV and

driving away.

### ii.     Enfield Robbery: February 24, 2021

12.     On February 24, 2021, at approximately 07:30 p.m., Enfield Police Department

responded to a reported robbery at an AT&T store at 7 Hazard Avenue in Enfield, Connecticut.

Enfield Police met with employees and a customer who were present during the time of the

robbery. Based on these witnesses' reporting, three unknown subjects (UNSUBS) had entered

the store through the front door. Surveillance video footage captured a gray sedan driving past the front of the store as the UNSUBS were entering the store. The witnesses described the UNSUBS as such:

   a. UNSUB 1: Black male; average build; long-sleeved black shirt; black gloves; all-black plastic face mask; black shoes; black head covering; cargo khaki pants; and wielding a black pistol.

   b. UNSUB 2: Black male; black jacket; black beanie; all-black plastic face mask; black gloves; black pants; black shoes; black backpack; and wielding a black pistol.

   c. UNSUB 3: Black male; black gloves; black long-sleeved shirt; all-black plastic face mask; black pants; black shoes; and wielding a black pistol.

13.     The UNSUBS entered the store and struck an employee (Witness 3) with a pistol. The UNSUBS then went to another employee (Witness 4) and a customer (Witness 5) who were near the display area of the store. The UNSUBS struck Witness 4 multiple times with a pistol and dragged all three witnesses to the employee back room. Witness 4 was forced to use his employee code to get into the inventory room. Once inside the inventory room, the UNSUBS told all the witnesses to lay face-down on the ground. The UNSUBS then placed multiple brand-new iPhones into a bag they had brought. Approximately $122,000.00 in iPhone inventory was stolen. A tracking decoy phone was left behind on the inventory shelf. The UNSUBS told the witnesses to count to 100 before getting up and then left the store. The following still images from security cameras depict some of the conduct described above:

6



### iii.    Canton Robbery: April 15, 2021

14.      On April 15, 2021, at approximately 7:30 p.m., Canton Police Department responded to a reported robbery at an AT&T store at 110 Albany Turnpike in Canton, Connecticut. Two employees and a customer were present during the incident. Based on these witnesses' reporting, four unknown subjects (UNSUBS) had entered the store through the front door. Surveillance video footage showed the UNSUBS getting out of a dark SUV that had parked near the front of the store. The witnesses described the UNSUBS as such:

> a.   UNSUB 1: Male, Gray striped hooded sweatshirt, gray sweatpants, black gloves, black face mask, black gloves, and wielding a black pistol.
>
> b.   UNSUB 2: Male, Navy blue striped hooded sweatshirt, black pants, black shoes, black face mask, black gloves, and wielding a black pistol.

7

    c.   UNSUB 3: Male, Gray striped hooded sweatshirt, black pants, black shoes, purple gloves, and black face mask.

    d.   UNSUB 4: Male, Black hooded sweatshirt, black pants, black shoes, purple gloves, black plastic face mask, and a brown bag.

15.    The UNSUBS came into the store, pointing their firearms at the customer (Witness 6) and the two employees (Witness 7 and Witness 8). The witnesses went down to the ground as the UNSUBS entered the store. Witness 7 and Witness 8 were dragged to the back room by the UNSUBS where the inventory was kept. Witness 6 was left behind at the showroom of the store. The UNSUBS held Witness 7 and Witness 8 at gun point and forced them to use their employee code to get into the inventory vault. While being held at gunpoint, Witness 7 was struck multiple times on the head. Once the vault was opened, the UNSUBS placed the iPhones into a bag they had brought. Approximately $125,000.00 in iPhone inventory was stolen. A tracking decoy phone was left behind on the inventory shelf. Witness 7 stated he noticed that the UNSUBS were speaking in what appeared to be Jamaican accents. The following still images from security cameras depict some of the conduct described above:



### iv.      Torrington Attempted Robbery: May 15, 2021

16.      On May 15, 2021 at approximately 7:22 p.m., Torrington Police Department responded to a robbery at an AT&T store located at 1919 East Main St. in Torrington, Connecticut. When Torrington Police arrived, the UNSUBS had already left the scene. Torrington Police spoke with the employees of the store who were present. Employees saw four UNSUBS exit an older model silver Honda sedan and run to the front door of the store. The UNSUBS attempted to get into the store, but as instructed by AT&T in response to the recent robberies, the employees had locked the front doors early. An employee saw one of the UNSUBS holding a handgun and described all four UNSUBS to be black males. The UNSUBS failed to get into the store and left. Based on the review of the surveillance video footage from AT&T, all four UNSUBS were seen wearing black face and head coverings.

### v.      Glastonbury Attempted Robbery: May 29, 2021

17.      On May 29, 2021 at approximately 7:25 p.m., Glastonbury Police Department responded to a robbery at an AT&T store located at 140 Glastonbury Blvd. in Glastonbury, Connecticut. When Glastonbury Police arrived on scene, the UNSUBS had already left. Glastonbury Police met with the employees of the store who were present. An employee stated she saw a black male with short hair wearing a blue gaiter (face mask) approach the store's front door, which had been locked early under AT&T's regional response to the robberies noted above. The employee opened the front door and spoke with the male in the entryway. The male asked if the store was still open. When the employee responded affirmatively, the male attempted to push his way inside. As the employee was holding the male from getting in, a silver Honda pulled in front of the store and two more black males came running out of the vehicle. Another employee saw that there was a struggle at the front door and yelled "Hey!" and ran towards the door. The UNSUBS then ran back towards the silver Honda and left. The first employee reported

9

seeing one of the males running up to the store with a black handgun. The store's surveillance was not working at the time of the attempted robbery.

### vi.    West Springfield Robbery and Arrests: June 6, 2021

18.    On June 6, 2021, at approximately 4:52 p.m., West Springfield Police Department responded to a robbery at an AT&T store located at 1018 Riverdale Street in West Springfield, Massachusetts.

19.    West Springfield Police spoke to the victims on scene. At approximately 4:00 p.m., the store manager left the building to go get lunch. On the way out of the office, the manager noticed that there was a black Jeep Cherokee, engine running, parked near the back door where the employees park. The manager at first thought it was her boss's vehicle because her boss drives the same vehicle, but then realized it was not her boss's vehicle. The manager observed that the black Jeep Cherokee did not have a front license plate.

20.    The manager returned from her lunch at approximately 4:45 p.m. and parked a couple of cars over from the black Jeep Cherokee, which was still present. As the manager started to walk back toward the back door of the store, four UNSUBS approached her while holding guns. Three UNSUBS were holding handguns and one UNSUB was holding a rifle. The UNSUBS pushed the manager with their firearms and forced her to open the back door to the store. As the manager entered the back room, another AT&T employee approached from the inside, attempting to render help. The UNSUBS directed both the manager and the employee into the back room at gunpoint. The manager used her code to access the inventory room where new devices were being stored.

21.    The UNSUBS also pushed the employee into the inventory room and force the employee to place new devices from the shelf into a bag that the UNSUBS had brought. The UNSUBS had brought three cloth bags with them in various colors. While three UNSUBS filled

10

their bags in the inventory room, the fourth UNSUB, with the rifle, stood at the door to the showroom. Once their bags were full, the UNSUBS left the store. The employee and the manager both left the inventory room once the UNSUBS left. The employee found a rifle magazine on the ground and placed it onto a table. The UNSUBS left the store with approximately 200 new electronic devices. Once the UNSUBS left the store, the manager pressed the panic alarm button and alerted 911. The following still images from security cameras depict some of the conduct described above:



22.     Two West Springfield Police detectives were patrolling the area of Elm Street in West Springfield when the robbery call was dispatched. The detectives were both aware of the recent AT&T robberies that had occurred in Connecticut.

23.     Dispatch relayed to the officers that the suspects had robbed an employee of AT&T at the above-mentioned address at gunpoint and escaped in a black Jeep Cherokee with a Massachusetts registration plate only on the rear of the vehicle. At approximately 4:54 p.m., while checking a McDonald's parking lot in the vicinity of the AT&T store, the detectives observed a black Jeep Cherokee with tinted windows parked at the intersection of East Elm Street and Riverdale Street waiting for a green light. The Jeep Cherokee bore a rear Massachusetts plate and did not appear to have a front license plate.

11

24.     Another West Springfield Police Officer was driving his marked patrol vehicle in the area. The detectives alerted the officer to the Jeep, and the officer attempted to stop it by activating his vehicle's lights and siren as the Jeep passed through an intersection. The Jeep did not stop; instead it sped up and continued to travel at a high rate of speed. The Jeep eluded officers, collided with several police cruisers, and finally came to a stop after colliding with a Massachusetts State Police cruiser while attempting to avoid spike strips that police had deployed. The totaled police cruiser is depicted below:



25.     Four individuals were apprehended after the vehicle pursuit in and near the vehicle. A fifth individual was apprehended after a short foot pursuit.

26.     A Vehicle Identification Number (VIN) check of the vehicle returned to Saviana Bourne. Bourne was the driver of the black Jeep Cherokee and was apprehended by police. In an inventory search of the vehicle, the West Springfield Police found three handguns and a rifle, depicted below:



27.     These firearms were weapons which will, and are designed to, and may readily be converted to, expel a projectile by the action of an explosive, specifically (1) an H and R, Model 32 S and W Revolver; (2) a VZOR 70 7.65 caliber pistol; (3) a Taurus .357 Magnum; and (4) an SKS Norinco 7.62 rifle. Investigators also recovered a substantial amount of ammunition from the suspects' vehicle.

28.     Also recovered from the vehicle were clothing, masks, and gloves consistent with those worn by the suspects in the robberies, and a significant number of Apple devices and other merchandise.

29.     West Springfield Police arrested five individuals at the scene: Saviana Bourne, Deshawn Baugh, Alex Josephs, Shaquille Raymond, and Ronaldo Smith.

30.     Based on, among other things, the commonalities among the robberies described above, including the appearance and attire of the suspects (dark clothing and novelty masks; consistent physical attributes of the individuals); the fact that they committed each of the

13

robberies around 7:30 p.m. on Saturdays until AT&T's security response thwarted that practice; and the common tactics displayed (three to four individuals rushing into the store with weapons drawn, immediately attacking employees, and quickly gaining access to inventory rooms and filling large bags with stolen phones and electronics); and the fact that some of the arrestees are of Jamaican descent, consistent with victim/witness accounts of hearing suspects speak with Jamaican accents, I believe that each of the robberies above was committed by members of the same crew.

        **B.**      **<u>Further Investigation After the West Springfield Arrests</u>**

                **i.**      **<u>Post-Arrest Interviews of Suspects and Seizure of Target Telephone 1</u>**

    31.    At the West Springfield Police Department, while being processed, Josephs, Smith, Baugh, Raymond, and Bourne gave their phone numbers as **Target Telephones 2–5 and 7**, respectively, as listed above. FBI Special Agents Tae Kim and Lisa MacNamara and Task Force Officer Matthew Hancock, and West Springfield Police Detective Cheyenne Azadan, also interviewed the five arrestees after advising them of their Miranda rights. The interviews took place between approximately 10:00 p.m. to 2:30 a.m. on June 6 and June 7, 2021. Each arrestee was taken out of their holding cell individually and was interviewed.

    32.    Smith, Raymond, Josephs, and Baugh (the four males) each told investigators that they did not have their phones with them because they left their phones at home. Bourne (the female) brought her phone with her, and it was ultimately recovered from the black Jeep Cherokee after Bourne consented to the search of the vehicle, which was registered to her. The phone found in Bourne's vehicle was seized and was later confirmed through forensic

examination by the FBI to be **Target Telephone 1** (i.e., a phone with a different number than the one Bourne had provided during police processing, which was Target Telephone 7).[1]

33.     The arrestees were also asked for their home addresses. One arrestee, Smith, gave the address of 217 Holcomb St., 3rd Floor, Hartford, Connecticut as his home address.

34.     Law enforcement databases list Smith's most recent address as 217 Holcomb Street. Databases also list 217 Holcomb Street as the most recent address for Josephs, although Josephs gave a different address (known to me) to investigators during his interview.

35.     Raymond stated he owns a black Apple iPhone 12 Pro Max, Baugh stated he owns an Apple iPhone, Smith stated he owns an Apple iPhone 12 Pro Max, and Josephs stated he owns an Apple 12 Pro Max with a black case. These are newer-model iPhones and consistent with the bulk of the devices stolen by the robbery crew.

36.     Josephs, Baugh, Raymond, and Smith then individually requested to speak to a lawyer, at which time their interviews were terminated.

37.     Saviana Bourne was read her Miranda rights and signed a written waiver. Bourne was interviewed in an interview room at the West Springfield Police Department by Special Agent MacNamara and Detective Azadan. Bourne stated she knew Josephs, Smith, Raymond, and Baugh as acquaintances and claimed they were supposed to go to a barbeque that day. Bourne also claimed she had no idea that the four individuals were carrying weapons (despite one of the weapons being the large, scoped rifle depicted above) or that they were going to rob a store when she picked them up in Hartford, Connecticut. She stated that once they got to the

---

[1] On June 11, 2021, United States Magistrate Judge Robert A. Richardson issued a search warrant authorizing the extraction and search of the device with phone number Target Telephone 1. That device contains data indicating that additional phone numbers have possibly been associated with that device previously; however, Target Telephone 1 was the number most recently used.

AT&T store in West Springfield, Massachusetts, Josephs, Raymond, Smith, and Baugh got out of her vehicle with masks on, carrying firearms. Bourne stated that she waited in the parking lot because she was afraid they would hurt her if she left. Once the four men left the store and reentered Bourne's vehicle, they pointed a gun to her and told her to drive away.

38.     As Bourne was being transported from the West Springfield Police Department to the Western Mass Regional Women's Correctional Facility, Bourne told the transporting officers, both West Springfield Police Officers, that she was willing to speak further with investigators about the robbery that had occurred.

39.     On June 7, 2021 at approximately 3:12 a.m., the same investigators reinterviewed Bourne at her request at the Western Mass Regional Women's Correctional Facility. Bourne was readvised of her Miranda rights and waived them again. Bourne then provided the following information: She admitted she had lied to investigators initially because she had been scared for her safety being so close to the other four arrestees. She informed investigators that, the morning of June 6, 2021, she had received a text message from Smith to get together. Bourne then drove to 217 Holcomb Street at approximately 9:30 a.m. to meet with Smith, Josephs, Raymond, and Baugh. Bourne reported that Josephs, Raymond, and Smith live at 217 Holcomb Street, on the top floor, and that she usually sees Baugh at this location too.

40.     Bourne and Baugh then traveled to Bloomfield, Connecticut, to look for a tag (license plate) to put on the back of their vehicle. Once they found a tag, they stole the registration and placed it onto their own vehicle, a black Jeep grand Cherokee. Bourne and Josephs then drove to Massachusetts to scope out different AT&T stores. They ultimately observed and chose the West Springfield AT&T store that was robbed later that day. Bourne and Josephs then drove back to Hartford, Connecticut.

41.     After returning home, Smith texted Bourne to meet everyone at 217 Holcomb Street at approximately 4:00 p.m. When Bourne arrived at 217 Holcomb Street, the other subjects got into her vehicle, and the group headed to the West Springfield AT&T.

42.     Bourne told investigators that she knew that everyone had a firearm, but that she did not see the (large) rifle until they got to the AT&T store. Bourne stated Smith was the one holding the rifle. Once they arrived at the AT&T store in West Springfield, Baugh, Josephs, Raymond, and Smith started putting on masks and then left to grab the manager who was walking back into the store. Shortly after, Smith, Baugh, Raymond, and Josephs ran back out and got into Bourne's vehicle. Bourne reported that Baugh shoved his pistol on Bourne's side and told her to drive. As Bourne was attempting to get away, the West Springfield Police got behind her vehicle and attempted to stop it. Bourne claimed she was forced to drive away, ultimately crashing into a Massachusetts State Police cruiser.

43.     Bourne stated that Joseph, Smith, Raymond, and Baugh had left their personal phones at Smith's residence at 217 Holcomb Street. Bourne reported that she primarily communicated with the other subjects through text messages and through Snapchat.

44.     Bourne was shown a Connecticut Intelligence Center (CTIC) bulletin regarding the first three AT&T robberies in Connecticut, which included some still images of the suspects. Bourne was able to identify Ronaldo Smith and Shaquille Raymond from images from the Enfield, Connecticut robbery, but denied being there with the subjects.

### ii.     Interview of Bourne's boyfriend

45.     On June 8, 2021, at approximately 08:00 a.m., at the FBI New Haven Field Office, Special Agent MacNamara and Task Force Officer Hancock interviewed an individual who claimed to be (or to have been) the boyfriend of Saviana Bourne. The interviewers found that the boyfriend gave credible answers to questions and that the information provided was

consistent with what investigators currently know about the robbery conspiracy outlined above. The boyfriend provided the following facts set forth below.

46.     The boyfriend met Saviana Bourne (Savy, to him) on February 13, 2021, and the two began dating. Approximately two weeks after meeting, the boyfriend moved into Bourne's apartment in Middletown, Connecticut. Bourne told the boyfriend that she worked at various AT&T stores and moved stores based on the company's needs. Bourne worked at AT&T stores in Middletown, Newington, and West Farms Mall.

47.     About two weeks into the relationship, Bourne told the boyfriend that she "does some heavy street stuff to make money." The boyfriend did not ask questions about the specifics until he was paid $2,000 cash by Bourne to stay quiet. Bourne then explained that she and other people would rob AT&T stores. Bourne warned the boyfriend to stay quiet because the people she works with are dangerous and would hurt him and his family. Bourne stated she had done three successful AT&T robberies with these people. Bourne told the boyfriend that, during one of the robberies, an employee was badly injured when the men beat the employee up for failing to cooperate with them. Bourne also told the boyfriend about an unsuccessful robbery around May 7-9, 2021, where the group could not enter the store because the doors were locked.

48.     The boyfriend stated that Bourne, due to her employment at AT&T stores, had intimate knowledge of the AT&T surveillance systems, security systems, panic buttons, timers on the safes, and interior layouts. She also knew that the inventory room was locked with a keypad that managers know. Bourne also knew that, if the exterior doors were locked and were broken or smashed, the alarm would sound. The boyfriend believed that Bourne shared this information with the people she did the robberies with.

49.     The boyfriend met the other members of the robbery crew, known to him as Deshawn, Ronaldo (Ron), Shaq, and Alex. He said that Ron and Alex were close friends and that they had been at Bourne's Middletown residence where Bourne cooked them food. Investigators showed the boyfriend press release photographs from the West Springfield June 6, 2021 arrest, and the boyfriend positively identified Deshawn Baugh, Ronaldo Smith, Shaquille Raymond, Alex Josephs, and Saviana Bourne.

50.     The boyfriend met the men at their residence, 217 Holcomb Street, 3rd Floor, in Hartford, on a few occasions. In the first visit, Bourne introduced him to the four men. Investigators showed the boyfriend a photograph of 217 Holcomb Street, which the boyfriend identified as the men's address. The boyfriend explained that the men park in the rear lot and use the rear staircase to enter and exit. In the second visit, the boyfriend stayed inside a vehicle while Bourne went inside for approximately five minutes. On the third occasion, about a month before the interview, the boyfriend entered the residence and met Shaq, Deshawn, Ronaldo, Alex, and Alex's girlfriend there. That time, the boyfriend saw one rifle, one handgun, marijuana, pills in baggies, and a cash counter. The rifle was upright on a green couch between Shaq and Alex.

51.     The boyfriend described Josephs and Bourne as the leaders of the group, Raymond as the muscle, and Baugh as a late addition to the group.

52.     The boyfriend recalled that, around late March 2021, he and Bourne went to a Party City store, where Bourne obtained masks, black gloves, black paint, and winter style gloves.

53.     The boyfriend also described his understanding of the group's three-day plan for their robberies. On day one, Josephs would text and call the members and tell them to meet at 217 Holcomb Street. This is when the organization would go over their plan to rob another

AT&T store. Members of the group would go on Facebook marketplace or Craigslist to find cheap vehicles to buy with cash.

54.     On day two, early in the day, members, typically Bourne and Josephs, would go and case AT&T locations. They would select a location and plan the robbery later that night. The robbery would take place near the store's closing time, when fewer people were inside. The members would use the newly purchased vehicle for the robbery, and the license plate would get replaced with a stolen license plate before the robbery. The members would wear dark clothing with long sleeves to cover their arms and legs, masks to cover their faces, and gloves to cover their hands. They would bring large bags to put the stolen phones in. Bourne would be the only person to take her cell phone, and she would turn the location services setting off once she left Holcomb Street.

55.     The boyfriend further reported that Bourne would then drive the vehicle and park outside the AT&T store and wait until the employees were away from desks where the panic buttons were located. Once they saw an opportunity, the men would then enter the store with firearms, secure the employees and customers, and go into the inventory room. Bourne would wait inside the vehicle. Once they robbed the store, the members would drive back together to Holcomb Street and count all the stolen phones and electronics.

56.     On day three, Bourne would leave Middletown and drive to Hartford to pick up Raymond with all the stolen phones and electronics. Bourne had a buyer for the phones, whom she would contact by phone to set up a meet. Bourne and Raymond would meet the buyer and show the buyer the stolen phones. The buyer would then leave and return with a large bag of cash. The buyer left with the phones, and Raymond and Bourne left with the cash. Bourne and Raymond then drove to Holcomb Street and counted the money with a cash counting machine.

20

The money would be divided evenly between the five people. A small portion of the money, between $4,000 and $5,000, would be given to an outsider who would be used as a lookout during a robbery. The boyfriend identified this individual, who is another roommate of Bourne's and referred to herein as **CW-1**. The boyfriend positively identified CW-1 through a Facebook picture.

57.     The boyfriend recalled that Bourne brought home cash on three occasions: the first in late February/early March (an unknown amount), the second about four weeks later ($18,000), and the third about four weeks after that ($14,000).

58.     In mid May 2021, the boyfriend and Bourne had a domestic altercation. They had a fight over Bourne's continued involvement in the robberies, which the boyfriend opposed. The police were contacted, and the boyfriend was ultimately arrested and charged with misdemeanor disorderly conduct. The case is pending.

59.     On the day of the West Springfield robbery, June 6, 2021, the boyfriend knew that Bourne was going to do a robbery. She was texting him throughout the day and said she was going to Massachusetts and Rhode Island. Around 5:00 p.m., Bourne stopped contacting him, and around 9:00 p.m., Bourne called and said she had been arrested and was being held in West Springfield. The boyfriend called Bourne's mother, who the boyfriend believes is a corrections officer in New York City.[2] Bourne's mother told the boyfriend to get rid of everything inside the apartment. The boyfriend began cleaning and he put phones inside a safe, including Bourne's

---

[2] Public records available over the internet show that a person with the name the boyfriend gave is employed as a correctional counselor in New York.

personal phone. The boyfriend then removed the safe from the apartment into a nearby dumpster. He told investigators he later saw a truck pick up the trash from the dumpster.[3]

60.     The boyfriend further explained that, the next day, June 7, 2021, Bourne's mother and another woman arrived at the Middletown apartment and cleaned it. According to the boyfriend, Bourne's mother took Bourne's belongings, including diaries and notebooks, and bleached the apartment clean. Bourne's mother also told other individuals who were there—CW-1, CW-1's girlfriend, and their baby—to leave the apartment.

### iii.     Search of 217 Holcomb Street, Encounter with Girlfriend 1 and Girlfriend 2, and Seizure of Target Telephones 2–4

61.     On June 8, 2021, United States Magistrate Judge Robert A. Richardson issued a warrant authorizing the search of 217 Holcomb Street, 3rd floor, and the seizure of particular items there, including the seizure and examination of any cell phones found at the property.

62.     While awaiting the issuance of this search warrant, investigators were stationed outside 217 Holcomb Street to prevent access by any persons who might destroy, tamper with, or remove evidence from the property. Investigators took this precaution in part because, as discussed above, Bourne's boyfriend had informed them that morning that, during the two days prior, Bourne's mother had orchestrated the destruction of Bourne's property, including cell phones, at Bourne's residence. Accordingly, investigators were concerned with potential similar destruction of evidence at 217 Holcomb Street.

63.     At approximately 5:30 p.m. on June 8, 2021, investigators executed the search warrant for 217 Holcomb Street. They recovered, among other things, black gloves, latex gloves, and fourteen-inch zip ties. The search did not yield any cellular phones, even though Josephs,

---

[3] After learning about the safe during the June 8, 2021 interview, investigators deemed it unrecoverable in light of Middletown's trash incineration schedule.

Raymond, and Smith had stated that their phones were on their beds. It appeared to investigators

that, as with Bourne's residence, someone had visited 217 Holcomb Street to remove/destroy

evidence.

64.     This was subsequently confirmed by an individual that investigators had

encountered while stationed outside 217 Holcomb Street in preparation for the search warrant.

This individual was encountered while she was approaching 217 Holcomb Street and stated that

she (**Girlfriend 1**) was in a relationship with one of the male suspects. Investigators also

interviewed another individual (**Girlfriend 2**) who accompanied Girlfriend 1. Investigators

found that Girlfriend 1 and Girlfriend 2 gave credible answers to questions and that the

information provided was consistent with what investigators currently know about the

conspiracy that is under investigation. Girlfriend 1 stated that she has intimate knowledge of

Josephs, Smith, Baugh, Raymond, and Bourne. Girlfriend 1 was at 217 Holcomb St., 3rd Floor,

on the night of June 6, 2021 (when the suspects were arrested in West Springfield). Girlfriend 1

received a phone call from Josephs, who told Girlfriend 1 that he had been arrested and

instructed Girlfriend 1 to leave the apartment. Girlfriend 1 grabbed Josephs' and Smith's cell

phones along with a South Dakota license plate from the residence before she left. Girlfriend 2

was at the apartment with Girlfriend 1 and grabbed Baugh's cell phone as she left with Girlfriend

1 at approximately 10:00 p.m. or 11:00 p.m.

65.     After admitting that they had removed these three cell phones from 217 Holcomb

Street, Girlfriend 1 and Girlfriend 2 led investigators to a parked vehicle at the rear parking lot of

178-180 Edgewood Street in Hartford, Connecticut and removed three cell phones from the

vehicle. Girlfriend 1 told investigators she had taken the phones after learning of these

individuals' arrests so she could answer the phones in case the individuals were called by their employer.

66.     Investigators seized these three cell phones, which are **Target Telephones 2-4**. Girlfriend 1 and Girlfriend 2 told investigators that **Target Telephone 2** belonged to Josephs, **Target Telephone 3** belonged to Smith, and **Target Telephone 4** belonged to Baugh. On June 11, 2021, Judge Richardson issued search warrants authorizing the extraction and search of Target Telephones 2–4. The FBI's review of those extractions has confirmed that the phone numbers provided by Girlfriend 1 and Girlfriend 2 are associated with the seized phones.

67.     **Target Telephone 5** has not been recovered. However, a query of that phone number through Cash App returns an account named $ShaqRaymond860, which corroborates Shaquille Raymond's providing Target Telephone 5 as his phone number during processing by West Springfield Police. Cash App is a mobile app through which users can send and receive payments using an account created with a phone number and associated with a "$cashtag," which is a unique identifier.

### iv.     Interview of 217 Holcomb Street Landlord

68.     While stationed outside 217 Holcomb Street on June 8, 2021, investigators interviewed another individual, who is the landlord of 217 Holcomb Street. The interviewers found that the landlord gave credible answers to questions and that the information provided was consistent with what investigators currently know about the robbery conspiracy outlined above.

69.     The landlord stated that on May 29, 2021 (the date of the Glastonbury attempted robbery), s/he returned home from work and was sitting in his/her parked car in the rear of 217 Holcomb Street when s/he saw the upstairs tenants come down the stairs with masks on the top of their heads wearing blue latex gloves. The landlord was shown photos in which s/he identified Raymond, Josephs, Smith, and Baugh as four of the five individuals who s/he saw. S/he stated

24

that Raymond took an Arizona license plate off of the back of a silver Honda and put a different

plate on it.[4] The Honda was also parked in the rear of the house. As the five individuals got into

the Honda, they got into the car they pulled their masks down. They were wearing dark colored

ski-type masks, and one was wearing a plastic black mask, which the landlord described as a "set

it off" mask.

70.     I know *Set It Off* to be a 1996 film starring Jada Pinkett, Queen

Latifah, Vivica A. Fox, and Kimberly Elise, in which a character in the film

wears the mask depicted to the right:



71.     From Bourne's Jeep Grand Cherokee that the suspects crashed on June 6, 2021,

investigators recovered the mask pictured below on the left. Below on the right is a still image

from the Enfield robbery, depicting an individual wearing what appears to be the same mask:



72.     The landlord stated that the Honda returned approximately 3 hours later. Four

males got out of the Honda and one female, whom the landord identified as Savania Bourne.

Bourne drove away in the Honda and returned a short time later, and the landlord observed

Bourne with a bag counting money in the car with the males.[5] The landlord stated that the plate

---

[4] A silver Honda was observed at the May 29 Glastonbury incident.

[5] As noted above, the landlord observed the suspects on the date of the Glastonbury *attempted*
robbery, which was unsuccessful. The FBI is continuing to investigate the source of the funds the

was changed back to the Arizona license plate. The landlord also said she had last seen the Honda about a month ago. The landlord stated that the tenants always have different cars, including a red Cherokee driven by Bourne, a black sporty car, a white Acura, a green Honda, a blue car, as well as other cars including a white Honda parked in the back of 217 Holcomb Street at the time of the interview.

<strong>v.     Interview of the "Lookout" and Review of Target Telephone 6</strong>

73.     On June 17, 2021, the FBI interviewed another individual who had been identified as a possible lookout during the robberies under investigation. The lookout had agreed to be interviewed and traveled to the Connecticut State Police Training Center in Meriden, Connecticut, to be interviewed. He provided the following information:

74.     The lookout stated that he had previously worked with Bourne, and that he resided with Bourne in Middletown, Connecticut. The lookout reported that he previously worked with Bourne at a Middletown FedEx, that Bourne now worked at a Middletown Toyota dealership, and that Bourne previously worked at AT&T.

75.     At first, the lookout stated that Bourne never asked him to participate in any robberies, and that he did not know why she would commit robberies because of the money she made at her job at the Toyota dealership.

76.     After the interviewers reminded the lookout to tell the truth about the robberies, the lookout stated that he had been homeless with his girlfriend, with whom he had an infant daughter. The lookout asked Bourne if he could get a job at AT&T. In February 2021, the

---

landlord observed on this date. While it is possible there was a separate, successful robbery on that date, investigators are aware of none and believe the funds more likely came from the sale of property that had been stolen in an earlier incident.

lookout moved into Bourne's apartment and asked her if there was any way he could make money.

77.     Some time after that conversation, Bourne told the lookout to "be free around six or seven." Bourne text messaged the lookout an address to go to. The lookout then drove Bourne's black Jeep Cherokee to an address provided by Bourne and parked near a restaurant. The lookout called Bourne and told her he was at the location. She told him to look for cops on the street. They stayed on the phone for about four or five minutes, during which time he heard approximately two to three male voices in Bourne's car. He recognized the voice of Ronaldo Smith, whom the lookout had worked with at Fed-Ex approximately three years prior. The voices, including Smith, were speaking in another language with Jamaican accents. As the lookout was waiting at the restaurant, he saw a gray Infiniti sedan. As that car was passing the lookout, Bourne told the lookout over the phone that she was passing where he was. The driver's seat window was down and the lookout observed Bourne in the driver's seat along with a front passenger. The lookout could not make out anyone in the back seats. Bourne pulled into the parking lot of the AT&T across the street from where the lookout was. After a while, Bourne told the lookout that they were coming out and told him to go home.

78.     The lookout further stated that he did not see Bourne until the next night at approximately 9–9:30 p.m. Bourne told the lookout that she would bring his money within the next day or two. Two days after the job, the lookout was out of the apartment. When he returned home, there was $2,500 on his bed in twenty-dollar bills in a white envelope.

79.     The lookout further stated that, two or three weeks later, Bourne told him there was another job coming up. The lookout was still jobless at this time. Bourne text messaged the lookout an address to go to. The lookout believed this address was somewhere in Enfield,

27

Connecticut. He stated that he parked in the D'Angelo's Sandwich shop parking lot across the street from the AT&T store. As before, the lookout drove Bourne's black Jeep Cherokee to this location. The lookout sat alone in the parking lot on the phone with Bourne. She told him to look up and down the street and tell her if he saw a police officer. The lookout saw Bourne pull to the left of the AT&T store. Due to a bad connection, the lookout could not understand what Bourne was saying on the phone. The lookout asked if she could hear him but soon after, Bourne told the lookout to go home. Before leaving the plaza, the lookout saw police respond to the area where the AT&T was located. The lookout stated it was dark out when the police arrived. The lookout received $2,500 for this job as well.

80.     The lookout further stated that, another two to three weeks later, Bourne asked him if he wanted to go on another job. The lookout declined Bourne's offer, after which she did not ask again.

81.     The lookout stated that he had deleted all text messages between himself and Bourne and no longer had them on his phone. He initially declined to consent to a search of his phone. Later in the interview, the interviewers asked again for his consent, explained that he did not have to consent, and that his phone would be seized and a warrant would be drafted and a judge would decide if there was probable cause to sign a search warrant for the phone. The lookout then stated that he understood that he did not have to consent, and he signed a form consenting to the search. The FBI's review of the phone is currently underway.

82.     The lookout was aware that some of the robbery attempts had failed. The lookout once asked Bourne where she was all day, and she replied saying that she had a job, but it didn't happen. Bourne once told the lookout that they went too late and that the store was already closed. Bourne told the lookout that approximately three times, it did not work out.

83.     At the interview, the lookout gave his phone number as **Target Telephone 6**. The FBI's subsequent review of the phone has confirmed that number to be accurate. That review also revealed that, on February 24, 2021, at 6:45 p.m., the lookout used Target Telephone 6 to call Target Telephone 7—the number provided by Bourne when she was arrested and which was listed in Target Telephone 6's contacts list as "Savy," a known nickname for Saviana Bourne. The phones were connected through Facetime (a video calling service) for approximately 52 minutes. This directly overlaps with the time and date of the Enfield robbery and is consistent with the lookout's statements that he was on the phone with Bourne during a robbery around this date.

84.     During the interview, the lookout recalled traveling to Enfield, and also to the Berlin Turnpike, and parking outside either an Outback Steakhouse or a Chick-Fil-A. Investigators believed he may be conflating or confusing multiple incidents, due to his involvement in multiple incidents as set forth above. Subsequently, the lookout agreed to and did travel with investigators to locations where some of the Connecticut robberies occurred. During that trip, upon observing the locations of the Canton, Torrington, and Glastonbury robberies, the lookout distinctly recalled traveling to those locations and was able to point investigators to precise locations where, at Bourne's direction, he had parked to observe the targeted AT&T stores. The lookout was not driven to the Enfield location, as he had distinctly recalled that incident during his interview. The lookout was also driven to a Hartford AT&T store, and he stated that he did not recognize that location.

### C.     Additional Information About the West Springfield AT&T

85.     Investigators obtained information from representatives of AT&T about the business of the West Springfield, Massachusetts AT&T. Specifically, as of September 7, 2021, so far this year, including during the time of the robberies discussed above, an average of 3.34%

of customer transactions in the West Springfield AT&T store came from Connecticut residents. The West Springfield store is located approximately ten miles from the Connecticut border. Also, the AT&T West Springfield location is part of the AT&T Connecticut Sales Region with the Sales Director being located in Meriden, CT.

86.     In addition, I know from my training and experience that cellular devices and internet-accessible devices (which comprise most of the stolen property in the robberies here) are routinely used not only to conduct intrastate telephone calls, but also to conduct interstate telephone phones and to access the internet.[6]

## **CONCLUSION**

87.     Based on the information in this affidavit, I have probable cause to believe that Saviana Bourne, Alex Josephs, Ronaldo Smith, Deshawn Baugh, and Shaquille Raymond committed the Target Offenses, specifically:

(1)     Conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), from on or about January 29, 2021 through June 6, 2021;

---

[6] As I have been informed by the prosecutor assigned to this investigation, the Second Circuit has "long recognized that '[t]he jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce. Even a potential or subtle effect on commerce will suffice.'" *United States v. Farrish*, 122 F.3d 146, 148 (2d Cir. 1997) (quoting *United States v. Angelilli*, 660 F.2d 23, 35 (2d Cir.1981)); *see also United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007) ("The Hobbs Act prohibits robberies that affect interstate commerce 'in any way or degree'; so the required showing of an effect on interstate commerce is *de minimis*." (citation omitted)); *United States v. Jones*, 30 F.3d 276, 285 (2d Cir. 1994) (holding that Hobbs Act jurisdiction is established by illegal interference "in any manner whatever with interstate commerce, even when the effect of such interference or attempted interference is minimal"); *Jund v. Town of Hempstead*, 941 F.2d 1271, 1285 (2d Cir. 1991) (stating that "any interference with or effect upon interstate commerce, whether slight, subtle or even potential … is sufficient to uphold a prosecution under the Hobbs Act"). "Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 276 (1999).

(2)    Hobbs Act robbery and aiding and abetting Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2, on or about June 6, 2021; and

(3)    Brandishing and aiding and abetting the brandishing of a firearm during and in relation to a crime of violence, specifically, the June 6, 2021 Hobbs Act robbery, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.

88.    Accordingly, I request that the Court issue arrest warrants for Bourne, Josephs, Smith, Baugh, and Raymond.

89.    As of this writing, those individuals are detained in Massachusetts in connection with charges brought by the Hampden County District Attorney's Office arising out of the West Springfield robbery. Accordingly, I plan to lodge the arrest warrants as detainers.

Respectfully submitted,

LISA
MACNAMARA
Digitally signed by LISA
MACNAMARA
Date: 2021.09.15 16:40:08 -04'00'

Lisa C. MacNamara
Special Agent, FBI

Subscribed and sworn to before me by telephone
on September 15, 2021, in Hartford, Connecticut.

Date: 2021.09.15
17:33:32 -04'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE